| | |
|---|---|
| TROY COULSTON, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 14-112 J |
| | ) |
| v. | ) |
| | ) District Judge Kim R. Gibson |
| STEVEN GLUNT, MR. WILT, | ) |
| MR. YOUNG, SHEA, DORETTA | ) Magistrate Judge Lisa Pupo Lenihan |
| CHENCHARICK, DORINA VARNER, | ) |
| And JOHN DOE, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by

Defendants Steven Glunt, CO Wilt, Mr. Young, Shea, Doretta Chencharick, Dorina Varner, and

John Doe (ECF No. 70) be granted, and that only the state law claims be dismissed without

prejudice to refiling in state court.

### II. REPORT

Plaintiff Troy Coulston ("Plaintiff") is an inmate in the custody of the Pennsylvania

Department of Corrections at SCI-Houtzdale. In his civil rights Complaint filed pursuant to 42

U.S.C. § 1983, Plaintiff alleges that Defendant CO Wilt ("CO Wilt") violated Plaintiff's Eighth

Amendment rights when he slammed a steel door on Plaintiff's leg and back. Plaintiff also

brings a retaliation claim arising from this incident when CO Wilt allegedly threatened to kill

Plaintiff if he continued with a civil rights action against two of CO Wilt's fellow officers.

Plaintiff further alleges state tort claims for assault and battery. Along with CO Wilt, Plaintiff

sued five other prison officials. On summary judgment, Wilt is the only Defendant remaining.[1] (ECF No. 41.)

On April 5, 2016, the Court held oral argument on the Motion for Summary Judgment presently before the Court. *See* ECF No. 93.

## A. Facts

The following facts are taken from the parties' Concise Statement of Material Facts and Response thereto, and are undisputed unless otherwise indicated.

On May 31, 2012, CO Wilt was working on A Unit, B Pod during the afternoon shift. (ECF Nos. 72 & 86, ¶ 1.) This was not CO Wilt's normal assignment—he typically worked night shift, from 10:00 p.m. until 6:00 a.m. In addition, CO Wilt's normal post was as an outside perimeter patrol officer. (ECF Nos. 72 & 86, ¶ 2.) The parties dispute whether CO Wilt was having difficulties with the inmates that day. CO Wilt states that he was having trouble getting inmates to exit B Pod during meal line and then again, during evening yard line. (ECF No. 72, ¶ 3.) Specifically, CO Wilt states that when yard was called that evening, the inmates were taking a long time to move out with some straggling behind. (ECF No. 72, ¶ 4.) Conversely, Plaintiff indicates that on the evening of May 31, 2012, inmates were proceeding from B Pod to yard in an orderly fashion, and no inmates were loitering on the pod. (ECF No. 86, ¶¶ 3-4.)

Record evidence includes a video (Defendant's Exhibit A) that shows the B Pod door at the top, and when the video begins at 07:05:30, the pod door is open and the yard has already been called. (ECF Nos. 72 & 86, ¶ 5.) About two (2) minutes after yard was called, CO Wilt announced from the officer's station inside the pod that line would end in one (1) minute. (ECF

---

[1] The Motion to Dismiss (ECF No. 70) was filed on behalf of all named Defendants, although all but CO Wilt were dismissed as a result of the Court's disposition of Defendants' Partial Motion to Dismiss (ECF No. 21). *See Memorandum Order,* ECF No. 45.

Nos. 72 & 86, ¶ 6.) The parties dispute whether CO Wilt gave a 30-second, and then a 15-second warning, and then counted down from 10. (ECF Nos. 72 & 8, ¶ 7.) The parties further dispute whether CO Wilt announced at the conclusion of the countdown that line movement was terminated. (ECF Nos. 72 & 86, ¶ 8.) CO Wilt contends that at that time, he gave direct orders to the inmates remaining on the pod to return to their cells because they forfeited their yard time by staying inside. (ECF No. 72, ¶ 8.)

At 07:08:50 on the video, CO Wilt can be seen moving to the door. (ECF Nos. 72 & 86, ¶ 9.) The parties' interpretation of what appears on the video, and why, is disputed. CO Wilt contends that his intention was to close the pod door to stop the inmates who were disregarding his direct orders to return to their cells. As he started closing the door, several inmates rushed to the door and slipped through, which he had not seen happen before. After a heavier-set inmate slipped through, followed by another, CO Wilt went ahead to close the door thinking there was a gap. At that point, another inmate suddenly appeared and squeezed or wedged himself into the doorway as CO Wilt was bringing the door shut. CO Wilt contends that this caught him by surprise and he held the door against the inmate for a second or two, and believes he ordered the inmate to stop pushing or go back to his cell. Wilt indicates that he did not push the door further, or slam it. According to CO Wilt, the inmate started to push back against the door, at which point CO Wilt pushed against it for a second or two using only one hand. According to CO Wilt, he learned at a subsequent time that this individual was Plaintiff Coulston. (ECF No. 72, ¶¶ 10-16.)

At this point, CO Wilt noticed a group of inmates behind him who had refused to return to their cells. According to CO Wilt, he realized that he needed to de-escalate the situation so he opened the door and let Plaintiff continue outside. Then Wilt opened the door again and two

3

other inmates left the pod to go to yard. According to CO Wilt, Plaintiff was wedged in the door for four (4) seconds—from 07:08:54 to 07:08:58 on the video. (ECF No. 72, ¶¶ 17-19.)

Conversely, Plaintiff indicates that CO Wilt intended to inflict pain and injury upon Plaintiff by catching him between the door and doorframe. That is, according to Plaintiff, CO Wilt did not close, or begin closing the door until Plaintiff stepped across the threshold. According to Plaintiff, CO Wilt did not believe there was a gap. In addition, Plaintiff states that CO Wilt recognized Plaintiff, and intended to catch Plaintiff in the door. Plaintiff further indicates that CO Wilt did not order Plaintiff to stop pushing or to return to his cell. Instead, according to Plaintiff, CO Wilt slammed the door on Plaintiff's chest and held him trapped until Plaintiff managed to wriggle free. Plaintiff maintains that he did not push back against the door, but that CO Wilt was pushing the door with a great force, enough to trap Plaintiff in the doorway and inflict considerable injuries. While trapped in the door, Plaintiff contends that CO Wilt threatened to kill him if he did not drop his lawsuit against Officers Domanick and Rosenbaum. Plaintiff indicates that CO Wilt held Plaintiff trapped in the door for at least five (5) seconds and did not release the door until after Plaintiff managed to wriggle free. Plaintiff further maintains that inmates were proceeding to yard in an orderly fashion. (ECF No. 86, ¶¶ 10-19, 31.)

The parties agree that the video then shows Plaintiff walking to the outside door where he turns and seems to wait for the two other inmates that CO Wilt let out behind Plaintiff. (ECF Nos. 72 & 86, ¶ 20.) Plaintiff then walked out into the yard and returned to the unit afterward. The parties disagree as to whether Plaintiff showed signs of injury. Plaintiff states that he limped after the incident. Plaintiff did not report the incident that evening or say anything about being hurt to CO Wilt or anyone else that evening. Plaintiff reported the incident the next day. (ECF Nos. 72 & 86, ¶ 22.)

4

The parties agree that it is important to the orderly, safe and secure operation of a prison to have controlled, disciplined inmate line movements. When evening line is called, many inmates go to yard, and those who do not must return to their cells. This takes away the opportunity to gather in large groups in the day room, which can spell trouble and danger with only one officer present. Also, with inmates back in their cells, there is an orderly routine for allowing limited numbers of inmates out of their cells to get hot water and ice (which is at a station near the door that goes to yard). (ECF Nos. 72 & 86, ¶¶ 23-26.)

The parties dispute whether on the evening of May 31, 2012, the inmates were proceeding to yard in a quick and orderly fashion. CO Wilt contends that the inmates were taking too long to exit the pod for yard and that they were ignoring his orders to return to their cells and were congregating around the door area. (ECF No. 72, ¶ 27.) Plaintiff asserts that the inmates were proceeding in a quick and orderly fashion and that CO Wilt did not order inmates to return to their cells after announcing that the line would end in one minute. (ECF No. 86, ¶ 27.) In addition, CO Wilt contends that by announcing the termination of line and closing the door, CO Wilt, who was alone on the pod, thought he could force the stragglers who were disobeying his orders to return to their cells. (ECF No. 72, ¶ 29.) Plaintiff contends that CO Wilt did not announce the termination of line after announcing that line would end in one minute. (ECF No. 86, ¶ 29.)

With regard to the alleged use of force, CO Wilt asserts that he was not trying to pin or wedge, let alone injure, anyone in the door, but was trying to close the door to restore order and regain control because the inmates were not complying with his orders. (ECF No. 72, ¶ 30.) Conversely, Plaintiff contends that CO Wilt's intention was to injure and cause pain to Plaintiff by intentionally slamming him in the door. (ECF No. 86, ¶ 30.) Plaintiff contends that CO Wilt

5

threatened his life while Plaintiff was trapped in the doorway. (ECF No. 86, ¶ 31.) CO Wilt denies he threatened Plaintiff but states that he may have ordered Plaintiff to stop pushing or to go back to his cell in that four (4) second interaction. (ECF No. 72, ¶ 31.) Plaintiff contends that CO Wilt did not order Plaintiff to return to his cell. (ECF No. 86, ¶ 31.)

The parties agree that Plaintiff did not complain of injury to anyone that evening. Instead he was seen in medical on Monday, June 4, 2012, after submitting a sick call slip on June 1, 2012. Physician Assistant Nagle ("PA Nagle") noted only a muscle spasm in Plaintiff's back and a small effusion of the right knee "which is a chronic problem the inmate has." PA Nagle noted that the back spasm could also have been caused by something as minute as twisting wrong while getting out of bed. PA Nagle gave Plaintiff a muscle relaxer and an anti-inflammatory and told Plaintiff to follow up if he had further issues. (ECF Nos. 72 & 86, ¶¶ 32-35.) No apparent injuries were noted in the report, but photographs of Plaintiff's back and knee taken during the medical examination show bruising. (ECF No. 86, ¶ 36.)

The parties agree that Plaintiff had complained of chronic knee pain for over five (5) years prior to the incident in issue. Plaintiff's medical grievances show that he was seen in sick call on November 17, 2011 and insisted that his right knee pain had to be more than arthritis even though his prior x-ray results showed moderate osteoarthritis with associated joint effusion and no fracture or deformity. On April 3, 2012, just over a month before the incident in issue, Plaintiff filed another grievance complaining about his right knee. His documented medical record shows that he claimed to have chronic knee pain since his arthroscopic surgery in 1991. On December 21, 2012, six (6) months after the incident in issue, Plaintiff filed another grievance against medical staff, this time for denying surgery to correct the "previous surgical" removal of cartilage in his knee joint. When Plaintiff saw the doctor on December 28, 2012, he

6

reported complaining of the right knee pain for five (5) years. At that time, another x-ray was ordered which again showed moderate osteoarthritis and no acute change from the previous x-ray in August 2011. (ECF Nos. 72 & 86, ¶¶ 38-44.)

The parties further agree that in Plaintiff's grievance against CO Wilt, his abuse complaint, and in his interview with security, Plaintiff never indicated that CO Wilt threatened him, and never mentioned the lawsuit he filed against the other SCI-Houtzdale officers (Domanick and Rosenbaum). In fact, when asked why he believed CO Wilt pinned him in the door, Plaintiff told security staff the following: "I don't know." (ECF Nos. 72 & 86, ¶¶ 45-46.)

The parties also dispute whether CO Wilt knew about Plaintiff's lawsuit against Officers Domanick and Rosenbaum. CO Wilt contends he knew nothing of the lawsuit, and therefore could not have threatened Plaintiff as he contends, when the facts underlying the present civil action occurred. (ECF No. 72, ¶ 47.) Conversely, Plaintiff insists that CO Wilt must have known of the lawsuit that Plaintiff was preparing against Domanick and Rosenbaum. That is, Plaintiff contends that it was known to CO Rosenbaum that Plaintiff was preparing the lawsuit because Plaintiff worked on the suit in the open day room, was seen doing so by CO Rosenbaum, and Rosenbaum questioned Andrew Tutko, another prisoner who was assisting Plaintiff with the lawsuit preparation. Therefore, according to Plaintiff, CO Wilt would have been informed of the lawsuit against Domanick and Rosenbaum by fellow staff who knew of it. (ECF No. 86, ¶ 47.) The parties do agree that Plaintiff's lawsuit against Domanick and Rosenbaum was not filed until over two (2) months after the door incident in issue, and Domanick and Rosenbaum were not served with that complaint until almost six (6) months later. (ECF Nos. 72 & 86, ¶¶ 48-49.)

7

### B. Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

## C. Analysis

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

### 1. Eighth Amendment Excessive Force claim

In determining whether CO Wilt violated Plaintiff's Eighth Amendment protection against excessive force, the Court's central inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (quoting *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)). The Court considers the following relevant factors in determining whether the force was excessive:

(1) "the need for the application of force";
(2) "the relationship between the need and the amount of force that was used";
(3) "the extent of the injury inflicted";

9

> (4) "the extent of the threat to the safety of staff and inmates, as
> reasonably perceived by responsible officials on the basis of
> facts know to them"; and
> (5) "any efforts made to temper the severity of a forceful
> response."

*Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321

(1986)). The Court also notes that "a showing of 'significant' or 'serious' injury is not necessary

to make an Eighth Amendment claim." *Brooks*, 204 F.3d at 107 (quoting *Hudson v McMillian*,

503 U.S. 1, 8 (1992)).

Here, in support of the Motion for Summary Judgment, CO Wilt argues that the video

evidence conclusively contradicts Plaintiff's version of events as to whether CO Wilt used

excessive force. Plaintiff contends that there are numerous issues of material fact in dispute and

that these issues must be decided by the trier of fact.

On summary judgment, this Court must view all evidence in favor of the nonmoving

party, Plaintiff Coulston, and draw all inferences in his favor. Plaintiff contends that CO Wilt

did not close or begin closing the door until Plaintiff stepped across the threshold. According to

Plaintiff, CO Wilt slammed the door on Plaintiff's chest, threatened his life, and held him

trapped until Plaintiff managed to wriggle free. Plaintiff asserts that he did not push back against

the door, but that CO Wilt was pushing the door with great force, enough to trap Plaintiff in the

door and inflict considerable injuries. Plaintiff insists that inmates were proceeding to yard in an

orderly fashion, suggesting that there was no need for the application of any force. (ECF No. 86,

¶¶ 10-19.) (ECF No. 85 at 2.)[2]

---

[2] Plaintiff also relies on a written reprimand dated August 26, 2013 wherein CO Wilt was found guilty of violating
the Department of Corrections Code of Ethics. The Court may not consider this document because it is inadmissible
evidence. *See, e.g., Conklin v. Rockwell*, No. 1:13-cv-132, 2015 WL 6456021, at *1 (W.D. Pa. Oct. 26, 2015)
(discussing *Delker v. Blaker*, Civil Action No. 09-710, 2012 WL 726415, at *6 (W.D. Pa. March 1, 2012) ("Simply
put, the policies of the Department of Corrections and the Eighth Amendment are not the same, and as such,
conclusions drawn by whatever body adjudicated Defendants' culpability with regard to their involvement in the . . .
incident do little more than obscure the issues.")). On summary judgment, a court may consider only that evidence

Yet, as to the Eighth Amendment claim for excessive force, the video presents a different story. This Court is guided by the directive of the United States Supreme Court that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on a videotape in assessing summary judgment evidence). The video produced by Defendant shows the B Pod door at the top, and when the video begins, the pod door is open and the yard has already been called. (ECF Nos. 72 & 86, ¶ 5.) The parties agree that about two minutes after yard was called, CO Wilt announced from the officer's station inside the pod that line would end in one (1) minute. (ECF Nos. 72 & 86, ¶ 6.) The video shows inmates exiting the B Pod door, CO Wilt approaching the door, and several inmates picking up the pace to exit the pod. A cluster of 4 inmates attempt to exit the B Pod door during the seconds when CO Wilt begins closing the door. All were able to hurry through except Plaintiff who became lodged in the door for a maximum of 4.5 seconds. After CO Wilt opened the door to allow Plaintiff to proceed to yard, CO Wilt permitted two other inmates to exit the B Pod door. The video shows, therefore, that contrary to Plaintiff's assertions, inmates were not proceeding in an orderly fashion because the final six (6) inmates were not exiting the pod in a timely and orderly way. Thereafter, CO Wilt slowly turns and walks back toward the pod desk. The video does not show a slamming of the pod door or any type of body movement that would suggest CO Wilt acted maliciously and sadistically. As he turns and walks back toward the pod desk, his body movements are slow and controlled. It is clear from the video that the force was applied in a good-faith effort to maintain and/or restore order to the line, and not maliciously or sadistically

---

which would be admissible at trial. *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990). Even if the Court were to consider this document, it would not alter its conclusion.

11

to cause harm to Plaintiff. Although CO Wilt admits that he could have chosen a better method to achieve his end goal of restoring order, no reasonable juror, upon viewing the video, could conclude that his method was maliciously or sadistically used to cause injury to Plaintiff. As noted by the United States Supreme Court, the simple overreaction by an officer is not enough to establish an Eighth Amendment violation:

> It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment *simply because it may appear in retrospect* that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

*Whitley*, 475 U.S. at 319 (emphasis added). Therefore, the Supreme Court rejected a post-hoc reasonableness approach that would deem acts as cruel and unusual punishment because they appear to have been unnecessary in hindsight. *See id.*

Plaintiff also contends that he suffered serious injuries as a result of CO Wilt's actions. Record evidence, however, reflects that PA Nagle noted only a muscle spasm in Plaintiff's back that could have been caused by something as minute as twisting the wrong way. Pa Nagle also noted a small effusion of the right knee "which is a chronic problem the inmate has." (ECF Nos. 72 & 86, ¶¶ 32-35.) Moreover, it is undisputed that Plaintiff had complained of chronic knee pain for over five (5) years prior to the incident. Six (6) months after the incident he complained of knee pain relating to a previous surgical removal of cartilage in his knee joint. (ECF Nos. 72 & 86, ¶¶ 38-44.) The record does not support Plaintiff's assertion that he suffered severe injuries

as a result of CO Wilt's actions. In addition, observing Plaintiff walking away from the door in the video, he is not limping or doing anything to indicate he is in any type of pain.

In sum, after viewing the video of the incident and considering all evidence of record, no reasonable jury could conclude that CO Wilt acted maliciously and sadistically to cause harm to Plaintiff. Therefore, it is respectfully recommended that Defendant CO Wilt's Motion for Summary Judgment as it relates to Plaintiff's Eighth Amendment excessive force claim be granted.

## 2. Retaliation

CO Wilt also moves for summary judgment on Plaintiff's retaliation claim. Co Wilt argues that Plaintiff did not exhaust his administrative remedies as to the retaliation claim. (ECF No. 71 at 13-14.) Plaintiff responds that his administrative remedies were unavailable to him because a reasonable fact-finder could conclude that Plaintiff was afraid of grieving the retaliation issue. (ECF No. 85 at 11-12.) At the summary judgment hearing, record evidence on this issue was argued by counsel for CO Wilt and Plaintiff.

Through the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law, until such administrative remedies as are available are exhausted. Specifically, the act provides, in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e (a). Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See Booth v.*

*Churner*, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes. *See Porter v. Nussle*, 524 U.S. 516, 532 (2002). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies prior to filing the action. *See Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* at 93 (quoting *Porter*, 534 U.S. at 525). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal." *Id.* at 83; *see also Spruill v. Gillis*, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See, e.g., Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000); *Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008); *Jetter v. Beard*, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available"). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *Davis*, 49 F. App'x at 368; *see also Brown v. Croak*, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); *Camp*, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. *Harris*, 149 F. App'x at 59. Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. *Davis*, 49 F. App'x at 368. Thus, an inmate's

confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. *Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. *Oliver v. Moore*, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Recently, the United States Court of Appeals for the Third Circuit held that "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013). The Court of Appeals noted that "[a]lthough the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." *Id.* (internal citations omitted) (citing *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

Here, the parties do not dispute that Plaintiff did not file a grievance relating to his retaliation claim. Likewise, the parties do not dispute that Plaintiff did not mention in his excessive force grievance, his abuse complaint, or in his interview with security that CO Wilt threatened him, or that he was filing a lawsuit against SCI-Houtzdale Officers Domanick and Rosenbaum. Further, the parties do not dispute that when asked why Plaintiff believed CO Wilt pinned him in the door, Plaintiff told security that he didn't know why. (ECF Nos. 72 & 86, ¶¶ 45-46.) Moreover, the parties do not dispute that Plaintiff grieved the excessive force claim and several claims before and after relating to medical care he received for his knee. (ECF Nos. 72 & 86, ¶¶ 32-35, 38-44.) In light of this record evidence, the Court finds that Plaintiff's administrative remedies were available to him. Just as he grieved the excessive force and

16

medical claims, Plaintiff could have filed a grievance relating to his retaliation claim. Plaintiff's statement that he was afraid to grieve the retaliation claim is not credible in light of the fact that he grieved the excessive force claim. Moreover, record evidence suggests that the retaliation claim was an afterthought in light of his response to investigators that he did not know why CO Wilt would close the door on him. Hence, the Court concludes that Plaintiff failed to exhaust his administrative remedies as to the retaliation claim.

Therefore, it is respectfully recommended that CO Wilt's Motion for Summary Judgment on Plaintiff's retaliation claim be granted.

3. State tort claims

Finally, Defendant CO Wilt moves to dismiss Plaintiff's state tort claims of assault and battery. CO Wilt contends that he was acting within the scope of his employment when Plaintiff became lodged momentarily in the door. Therefore, he is protected by sovereign immunity. (ECF No. 71 at 15-16.) Plaintiff responds that a reasonable fact finder could conclude that CO Wilt's actions were not within the scope of his employment, but were deliberate, malicious, and unexpected by his employer. Thus, Plaintiff concludes that CO Wilt is not protected by the doctrine of sovereign immunity. (ECF No. 85 at 10-11.)

The Court need not undertake this analysis, however, because it should dismiss all claims over which it has original jurisdiction. Therefore, in its discretion, the Court should decline to exercise its supplemental jurisdiction over these state law claims. Consequently, it is respectfully recommended that the Court, in its discretion, refuse to exercise its supplemental

jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over the remaining state law claims, and that these claims be dismissed without prejudice to refiling the state law claims in state court.[3]

### III. CONCLUSION

For the above reasons, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Steven Glunt, CO Wilt, Mr. Young, Shea, Doretta Chencharick, Dorina Varner, and John Doe (ECF No. 70) be granted, and that only the state law claims be dismissed without prejudice to refiling in state court.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: April 22, 2016                    BY THE COURT:

---

[3] The dismissal of the state law claims without prejudice should not work to Plaintiff's disadvantage in that 28 U.S.C. § 1367(d) provides for at least a 30-day tolling of any applicable statute of limitation so as to allow a plaintiff to refile state law claims in state court.

LISA PUPO LENIHAN
United States Magistrate Judge

cc: All counsel of record
Via electronic filing